# 2007 DTA 124

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN**
**PANEL II**

PLAZA NORESTE, INC.
Demandante-Recurrida

v.

STELLA PROPERTIES, INC.
Demandada-Recurrida

v.

M.O & ASOCIADOS, INC.
Interventora-Peticionaria

PLAZA NORESTE, INC.
Demandante-Recurrida

v.

STELLA PROPERTIES, INC.
Demandada-Recurrida

M.O. & ASOCIADOS, INC.
Interventora-Peticionaria

Núms. Cons. KLCE-2007-01039 / KLCE-2007-01148

San Juan, Puerto Rico, a 26 de octubre de 2007

Panel integrado por su Presidenta, la Juez García García,
la Juez Varona Méndez y el Juez Cabán García

Varona Méndez, Jueza Ponente

**TEXTO COMPLETO DE LA SENTENCIA**

Atendidos los recursos de *certiorari* del caso KLCE-2007-01039 y KLCE- 2007-01148 presentados por M.

Publicaciones JTS presenta dos nuevas obras de Derecho Penal:
Derecho Procesal Penal: Etapa investigativa y Derecho Penal Sustantivo

JTS

# Ernesto L. Chiesa

# DERECHO PROCESAL PENAL: ETAPA INVESTIGATIVA

Ernesto L. Chiesa obtuvo su bachillerato en Artes (Filosofía) en la Universidad de Puerto Rico en 1964; obtuvo una Maestría en Filosofía en la misma institución en 1967. Luego cursó estudios doctorales en Lógica en la Universidad de California en Berkeley. En 1974 obtuvo el grado de Juris Doctor –Magna Cum Laude– en la Escuela de Derecho de la Universidad de Puerto Rico. Ha ocupado diversas posiciones en la Universidad de Puerto Rico desde 1964 hasta el presente, incluyendo Catedrático de la Escuela de Derecho donde dicta cursos de evidencia, derecho penal y procedimiento criminal. Ocupó el puesto de Secretario del Tribunal Supremo desde septiembre de 1976 hasta agosto de 1981. Fue colaborador del Tribunal Supremo en la preparación del Proyecto de Reglas de Evidencia que finalmente fuera aprobado en el 1979. Ha publicado sendos artículos de revistas jurídicas. Ha sido principal colaborador de la publicación JTS® ™ y autor del Análisis Editorial de Práctica Procesal Puertorriqueña – Evidencia y de la obra Derecho Procesal Penal de Puerto Rico y Estados Unidos. Su Obra Magna es el Tratado de Derecho Probatorio, bajo el sello editorial de Publicaciones JTS. El Profesor Chiesa es continuamente citado por el Tribunal Supremo al igual que por el Tribunal de Apelaciones y los Tribunales de Primera Instancia en Puerto Rico. Entre sus múltiples distinciones profesionales se cuentan: Miembro del American Law Institute; Director de la Conferencia Judicial de Puerto Rico (1990-93); Presidente del Comité de Reglas de Evidencia de la Conferencia Judicial de Puerto Rico (1984-88); Miembro del Comité de Procedimiento Criminal y Evidencia (1984-92); Miembro Honorario del Ilustre Colegio de Abogados Penalistas de Bogotá (1994) y Académico Numerario de la Academia Puertorriqueña de Jurisprudencia y Legislación.

Actualmente preside el Comité del Tribunal Supremo que revisa las Reglas de Procedimiento Criminal (con el objetivo de someter a la Asamblea Legislativa unas nuevas reglas) y es miembro de otro Comité del Tribunal Supremo que revisa las Reglas de Evidencia. Fue miembro del Comité del Tribunal Supremo que estuvo a cargo de la Revisión del Manual de Instrucciones al Jurado. Desde hace más de 18 años, el Profesor Chiesa trabaja como asesor del Secretario de Justicia y del Procurador General en materia de Derecho Penal, Derecho Procesal Penal y Evidencia.

Esta obra pretende presentar una exposición del derecho procesal penal en la etapa investigativa, con énfasis en los derechos constitucionales que amparan al ciudadano en esa etapa del procedimiento. Habida cuenta de la primacía de la Carta de Derechos en esta zona, se alude continuamente a la jurisprudencia de la Corte Suprema de los Estados Unidos y a la del Tribunal Supremo de Puerto Rico, que son las fuentes de derecho primarias. Como es harto sabido, los derechos de la persona reconocidos en la Carta de Derechos de la Constitución de los Estados Unidos tienen que ser reconocidos por los gobiernos de los Estados y de Puerto Rico, aunque éstos pueden reconocer garantías adicionales. En el Capítulo I se aborda lo relativo a la aplicación de la Carta de Derechos de la Constitución de los Estados Unidos a Puerto Rico.

En el Capítulo II se expone el derecho que gobierna el interrogatorio de testigos y sospechosos, materia gobernada por las cláusulas del debido proceso de ley, privilegio contra la autoincriminación y asistencia de abogado. Se aborda, además, lo relativo a la determinación de admisibilidad y suficiencia de las declaraciones obtenidas en esa etapa. Aquí, el derecho constitucional es totalmente controlante, con poca regulación estatutaria.

En el Capítulo III se expone el derecho aplicable a los procedimientos de identificación de sospechosos fuera de corte. Se aborda la protección constitucional que brindan el debido proceso de ley y el derecho a asistencia de abogado, y se explica por qué no hay protección bajo el derecho contra la autoincriminación. Se alude también al rol del derecho a la intimidad en esta zona. Por supuesto, se aborda la regulación estatutaria en la Regla 252 de Procedimiento Criminal.

En el Capítulo IV, por mucho el más extenso, se aborda el complicado derecho que rige la protección constitucional contra registros y detenciones irrazonables, tanto bajo la Enmienda Cuarta, como bajo la mayor protección que surge de las secciones 1, 8 y 10 de la Carta de Derechos de la Constitución de Puerto Rico. Por supuesto, se considera también la regulación en las Reglas de Procedimiento Criminal, particularmente la Regla 234 que gobierna lo relativo a la moción de supresión de evidencia. Es en este Capítulo que se aborda el derecho constitucional a la intimidad. Se aborda primeramente todo lo relativo a la regla de exclusión en que se traduce la protección constitucional (alcance de la regla de exclusión y la

moción de supresión) y luego se aborda el alcance de la protección constitucional. Esto, a su vez, se divide en las exigencias para una orden judicial de arresto o de registro (warrant clause) y en la exigencia constitucional de razonabilidad para arrestos o registros sin orden judicial. De ahí la necesidad de aludir al derecho que gobierna el arresto sin orden y lo relativo a los distintos registros sin previa orden judicial. También se consideran registros y detenciones particulares, como el "stop and frisk", la detención y registro de vehículos, registros administrativos y otros.

Finalmente, en el Capítulo V se aborda el derecho constitucional contra la autoincriminación. Primeramente se aborda el derecho en general: su alcance, limitaciones, la inmunidad como mecanismo para neutralizar el privilegio, etc. Luego se atiende lo relativo al derecho especial que ampara al ya acusado, a no declarar y a que no se hagan inferencias del ejercicio de ese derecho. Aunque esta dimensión del derecho supone ya el inicio de la acción penal (más allá de la etapa investigativa), se incluye para presentar una visión más completa del derecho contra la autoincriminación. En el Capítulo II ya se había abordado el derecho contra la autoincriminación en la zona del interrogatorio de testigos y sospechosos (Miranda y su progenie).

Se advierte que queda fuera de ese libro lo relativo al derecho especial que gobierna la legislación federal especial "antiterrorista", es decir, el Patriot Act y las acciones legislativas y ejecutivas en esta sensitiva zona. Para eso hay que considerar la literatura especializada y esperar por más jurisprudencia de la Corte Suprema que aclare la validez de las limitaciones a los derechos constitucionales de la persona que entraña esa legislación.

Este libro va dirigido a estudiantes, abogados, fiscales y jueces. No hay pretensión alguna más allá de ayudar a éstos a encontrar, y tal vez entender mejor, el derecho positivo que aparentemente gobierna los procesos de investigación criminal tratados en este trabajo. Por supuesto, estamos ante una zona de continuo devenir; se produce mucha jurisprudencia que cambia ese pretendido derecho positivo. De ahí la necesidad de suplementar anualmente este libro para incorporar la jurisprudencia del Tribunal Supremo de Puerto Rico y de la Corte Suprema de los Estados Unidos.

# Lic. Luis E. Chiesa

Luis Ernesto Chiesa Aponte es Profesor Adjunto de Derecho Penal en la Facultad de Derecho de Pace University en White Plains, New York. Obtuvo su Bachillerato en Administración de Empresas y revalidó como Contador Público Autorizado. Luego obtuvo su grado de Juris Doctor (Summa Cum Laude) en la Facultad de Derecho de la Universidad de Puerto Rico. Posteriormente, recibió el grado de Maestría en Derecho (LL.M) de Columbia University. Actualmente se encuentra cursando estudios conducentes al grado de Doctor en las Ciencias Jurídicas (J.S.D.) en Columbia University. Una porción de su tesis doctoral, la cual versa sobre ciertos aspectos debatidos de la teoría de la antijuricidad penal, ha sido aceptada para publicación en el Buffalo Criminal Law Review. Además, ha publicado sendos artículos en las principales revistas jurídicas de Puerto Rico sobre distintos aspectos del derecho penal.

Antes de comenzar sus labores docentes en Pace University, Luis Ernesto Chiesa fue Profesor Adjunto de Derecho Penal en la Facultad de Derecho de la Universidad de Puerto Rico y Oficial Jurídico del Juez Presidente del Tribunal Supremo de Puerto Rico, Hon. Federico Hernández Denton. Durante dicho tiempo, fue asesor del Comité para la Revisión del Manual de Instrucciones al Jurado de Puerto Rico adscrito al Secretariado de la Conferencia Judicial.

La teoría de la responsabilidad penal que sirve de base al Nuevo Código Penal es totalmente distinta a la que inspiró el Código Penal de 1974. A consecuencia de ello, bajo el Nuevo Código Penal es posible aducir una multiplicidad de planteamientos que bajo el Código Penal de 1974 no podían defenderse con seriedad. Ahora, por ejemplo, puede argumentarse que quien no contribuyó de forma significativa a la comisión del delito debe ser castigado mucho menos severamente que los verdaderos "autores" de la ofensa (Arts. 43-45 del Nuevo Código Penal). Esto era insostenible bajo la normativa sobre coautoría que se había adoptado en el viejo código (Art. 35 del Código Penal 1974).

Además, conforme al Artículo 9 del Nuevo Código Penal, el principio de favorabilidad ahora claramente aplica también hasta en los casos en que el convicto está cumpliendo su sentencia. Ello era, cuanto menos, dudoso bajo el anterior código. La figura de la tentativa también sufrió cambios.

Ahora solamente pueden hallarse incurso en tentativa quienes ejecutan el último acto necesario para consumar el delito. Según el viejo código, esto no era un elemento esencial de la tentativa.

De otra parte, a tenor con el Artículo 13 del Nuevo Código Penal, ya no rige en Puerto Rico la doctrina de "interpretación restrictiva" de los estatutos penales. Ahora, distinto a lo que ocurría bajo la normativa desarrollada por el Tribunal Supremo en cuanto a este particular, las leyes criminales pueden interpretarse tanto restrictiva como extensivamente. La única interpretación prohibida es la "analógica" en virtud de la cual se crean judicialmente nuevos delitos o penas.

Para entender cabalmente estos y el resto de los cambios sustanciales que ha sufrido nuestro ordenamiento penal como consecuencia del Nuevo Código, es necesario realizar un análisis comparado de los preceptos contenidos en dicho código. Sólo así puede comprenderse el alcance de las nuevas doctrinas que han sido incorporadas al derecho penal puertorriqueño por medio de este nuevo intento codificatorio. Precisamente ese es el propósito de esta obra.

El análisis que hacemos de la materia equipará al estudiante y al profesional con los conocimientos necesarios para poder sacarle el máximo provecho al Nuevo Código Penal.

Incluimos, además, el texto completo del Nuevo Código Penal con Anotaciones del Lic. Chiesa en relación con la Jurisprudencia Interpretativa del Tribunal Supremo y las enmiendas legislativas que ha sufrido dicho Código. También, se incluye sin costo alguno un DVD que contiene sobre 4,500 págs. de los documentos del historial legislativo del Nuevo Código Penal, que incluyen, entre otros: Los estudios de base, las ponencia de las Vistas Públicas sobre el Código, los Proyectos radicados en el Senado y la Cámara, los Informes de Comisión, el debate y votación final en el Senado y el trámite en la Cámara; el Código Penal y sus enmiendas y las Leyes Complementarias a la Reforma del Código Penal.

## *El bosquejo de la obra es el siguiente:*

► Introducción

• Breve recuento del proceso que culminó con la aprobación del Nuevo Código Penal

• Examen de las bases conceptuales que subyacen al Nuevo Código Penal

► Limitaciones Constitucionales al Ejercicio del Poder Punitivo

• Implicaciones del debido proceso de ley para la redacción e interpretación de leyes penales

• Leyes Ex Post Facto y la Jurisprudencia Reciente Sobre este Particular

• Proporcionalidad y Castigos Crueles e Inusitados

• Separación de Poderes y el Llamado "Delito Administrativo"

• Los Límites al Poder de Criminalizar Conductas que Impone el Debido Proceso Sustantivo y el Derecho a la Intimidad

► Limitaciones Estatutarias al Ejercicio del Poder Punitivo

• El Principio de Legalidad y sus Cuatro Consecuencias

• La Eliminación de la Regla de Interpretación Restrictiva

• El Problema de las Fuentes del Derecho Penal y la Limitada Aplicabilidad del Principio de Legalidad en Puerto Rico

• El Más Robusto Principio de Favorabilidad del Nuevo Código Penal

» Los Problemas de la "Tercera Ley"

» Las Leyes Intermedias

» Las Leyes Temporales como Excepción a Este Principio (Art. 10 del Nuevo Código Penal)

• El Concurso de Leyes y Delitos

» Concurso Real

» Concurso Ideal y Medial

» Concurso Aparente

» Delito Continuado

» Delito Masa – ¿Aplica a Puerto Rico?

► El Primer Eslabón de la Teoría de la Responsabilidad Penal – El Comportamiento Humano

• Acciones Penalmente Relevantes

• Omisiones Penalmente Relevantes

• La llamada Comisión por Omisión (Art. 19 del Nuevo Código Penal)

• La Posesión como Comportamiento

• Casos Límite – Hipnosis, Sonambulismo, Eutanasia

► El Segundo Eslabón de la Teoría de la Responsabilidad Penal – La Antijuricidad

• Elementos Objetivos de la Ofensa

• Causalidad y la Nueva Figura de "imputación objetiva" y "riesgo permitido" (Art. 25)

• Elementos Subjetivos – Dolo Eventual v. "Temeridad" o "Recklessness"

• Los Elementos Subjetivos Distintos a la Intención y su Relación con la Eximente de Intoxicación Voluntaria

• El Error de Tipo del Art. 19 como una Forma de Excluir la Intención

• Las Defensas de Justificación en Puerto Rico – La Nueva y Más Restrictiva Defensa de Estado de Necesidad

► El Tercer Eslabón de la Teoría de la Responsabilidad Penal en Puerto Rico – La Punibilidad

• El Mayor Alcance de la Eximente de Coacción

• La Nueva Defensa de Temor Insuperable

• Las Defensas No-Exculpatorias y el Entrampamiento

INCLUYE CD QUE CONTIENE SOBRE 5,000 PÁGS. DE LOS DOCUMENTOS DEL HISTORIAL LEGISLATIVO DEL NUEVO CÓDIGO PENAL

Publicaciones JTS presenta dos nuevas obras de Derecho Penal:
Derecho Procesal Penal: Etapa Investigativa y Derecho Penal Sustantivo

PRSRT STD
U.S. POSTAGE
PAID
SAN JUAN, P.R.
PERMIT NO. 1175

PO BOX 9024120
SAN JUAN, P.R. 00902-4120
TEL. 721-0200

P.O. Box 9024120
San Juan, P.R. 00902-4120
Tel. 721-0200  Fax. 721-0205
www.pub-jts.com

Sres: Favor enviarme un ejemplar de su nuevo libro:                    Fecha_____

____ Derecho Procesal Penal: Etapa Investigativa (Prof. Chiesa) - $100.00 + $3.50 S/H = $103.50
____ Derecho Penal Sustantivo (Lic. L. E. Chiesa) - $100.00 + $3.50 S/H = $103.50
____ Ambos libros (un ahorro de $50.00) - $150.00 + $6.00 S/H = $156.00

Envíese a Lcdo(a). _____
Dirección _____
_____ Zip Code _____
Tel: _____ Fax _____ E mail _____

Forma de pago: ___ Adjunto cheque por $_____ pagadero a Publicaciones JTS.
Cárguese el importe de esta orden ($_____) a mi tarjeta de crédito: ___AX ___MC ___VISA
Núm. de tarjeta _____ Fecha exp. _____ Firma_____

Autorizo a Publicaciones JTS a renovar automáticamente estas suscripciones a su aniversario (12 meses calendario).
De no desear la renovación enviaré cancelación escrita a Publicaciones JTS.

O. & Asociados, Inc., por tratarse la revisión de la misma resolución y en aras de la economía procesal, se ordena la consolidación de los mismos.

M.O. & Asociados, Inc. nos pide que revisemos, por vía de *certiorari,* una resolución dictada por el Tribunal de Primera Instancia, que le denegó intervenir en un pleito civil. Por los fundamentos discutidos, expedimos el recurso KLCE-2007-01039 y revocamos el dictamen recurrido. Asimismo, desestimamos el recurso KLCE-2007-01148, por haber sido presentado fuera del término dispuesto para ello.

## I

Para poder entender mejor la controversia suscitada, hacemos un recuento de los hechos y de los procesos seguidos en el caso. Para ello, tomamos conocimiento judicial de los casos KLAN-2006-01176, KLCE-2005-00183 y KLCE-2006-01652, ante este Tribunal.

El 1 de marzo de 1999, la parte aquí peticionaria suscribió un contrato de opción con Stella Properties, por conducto de su Presidente, el Sr. Eduardo Ferrer Bolívar, dirigido a la adquisición eventual del PH 1903 ubicado en el Condominio Plaza Stella en Condado mediante el contrato de compraventa correspondiente, por la suma de $1,305,000.00. M.O. & Asociados, Inc. surge como la parte optante al inicio del contrato de opción. El pronto pago por la unidad era $135,000.00. En tal ocasión, los apelados pagaron $20,000.00 por concepto de pronto pago, y la diferencia hasta el 10% sería pagada en plazos una vez comenzada la construcción del edificio.

El 18 de abril de 2001, la Sra. Nitza Pagán, gerente y corredora del Proyecto Plaza Stella, le remitió una carta a los apelados solicitando la cantidad de $110,500.00, según lo pactado en el contrato de opción, en vista de que el edificio se había elevado hasta el piso 11. La parte peticionaria efectuó el pago solicitado.

En el ínterin, M.O. & Asociados solicitó ciertos cambios a la unidad que ascendieron a un costo adicional de $74,875.00. Plaza Stella, por conducto del señor Ferrer Bolívar, le remitió las facturas a M.O. & Asociados a través del señor Camino, y solicitó que los cheques fuesen emitidos a favor de Empresas Ferrer. Stella Properties era la dueña del Proyecto Plaza Stella y a su vez, una corporación presidida por el señor Ferrer Bolívar. A su vez, Empresas Ferrer era una corporación también presidida por éste y cuyo nombre aparece en ciertos documentos enviados por Stella Properties/Plaza Stella. Tales sumas fueron debidamente pagadas.

El 28 de septiembre de 2003, el señor Ferrer Bolívar le informó al señor Camino que el contrato de compraventa quedaba resuelto porque no otorgó la escritura de compraventa ni se llevó a cabo el cierre de la unidad a pesar de habérsele advertido sobre ello. En respuesta a dicha misiva, los apelados le remitieron carta al señor Ferrer Bolívar solicitando dejara sin efecto el aviso de terminación de contrato y procedieran al cierre de la unidad luego de la inspección del apartamento. El señor Ferrer Bolívar respondió en la negativa.

Así las cosas, los apelados presentaron demanda sobre incumplimiento de contrato y daños y perjuicios contra Empresas Ferrer, Stella Properties, en el caso KPE2003-2762 (902), solicitando, además, el cumplimiento específico del contrato de compraventa, a saber, el otorgamiento de la escritura de compraventa y el cierre de la unidad. Tras los trámites de rigor, el Tribunal de Primera Instancia dictó sentencia, en la que ordenó a los demandados en aquel caso a cumplir lo pactado en el contrato de compraventa, entre otros remedios. Mediante sentencia dictada en apelación (KLAN-2006-01176), este Tribunal confirmó la sentencia dictada por el foro primario y dictaminó que Stella Properties estaba obligada a dar cumplimiento específico al contrato, según lo había solicitado la aquí peticionaria.

Antes de que recayera sentencia en el caso KPE2003-2762 (902), Plaza Noreste, Inc. presentó la demanda objeto del presente recurso el 6 de junio de 2005, por cobro de dinero y ejecución de prenda e hipoteca contra Stella Properties, Inc. En dicha demanda, Plaza Noreste, Inc. reclamó a Stella Properties, Inc., la suma de

$2,464,400.00, por concepto de la suma principal adeudada en virtud de un contrato de préstamo, más 5% de interés anual desde el 18 de marzo de 2005 y costas, gastos y honorarios de abogado. Se desprende también de la demanda que Stella Properties otorgó un *"Pledge Agreement"* y entregó a Plaza Noreste un pagaré hipotecario a nombre de Firstbank, debidamente endosado.

Asimismo, se alegó en la demanda que el PH 1903, [que había sido objeto de litigio entre la parte peticionaria y Stella Properties en el caso KPE2003-2762(902)] está gravado con la hipoteca cuya ejecución se solicita; se afirma que dicho apartamento fue objeto de escritura de individualización y liberación otorgada en San Juan, Puerto Rico el 18 de noviembre de 2004.

Tras ser emplazada, Stella Properties, Inc. no hizo alegación alguna. El 20 de septiembre de 2005, Plaza Noreste Inc. solicitó que se anotara la rebeldía de Stella Properties y que se dictara sentencia en rebeldía, a cuya solicitud unió extensa prueba documental. Stella Properties nunca realizó pago alguno de la deuda, desde el momento mismo en que se constituyó la obligación.

El 8 de noviembre de 2005, el foro recurrido dictó sentencia de ejecución de hipoteca por la vía ordinaria, en contra de Stella Properties, notificada el 17 de noviembre de 2005. Mediante dicha sentencia, se ordenó a Stella Properties a pagarle la suma de $2,464,260.00 a Plaza Noreste, más intereses a razón de 5% y $246,260.00, por concepto de honorarios de abogados, gastos y costas.

El 19 de enero de 2006, Plaza Noreste solicitó orden de ejecución de la sentencia, la cual fue dictada el 1ro. de febrero de 2006, notificada el 6 de febrero de 2006. A tenor, el 1ro. de marzo de 2006 se expidió Edicto de Subasta, en el que se informa que el tipo mínimo de la subasta sería de $6,000,000,000. Se dispuso que la fecha de la primera subasta sería el 3 de mayo de 2006 a las 11:00 AM y la segunda fecha el 10 de mayo, con un tipo mínimo de $4,000,000 y la tercera fecha el 17 de mayo de 2007 a un tipo mínimo de $3,000,000.

Del Edicto de Subasta se desprende que al Asiento 67 del Diario 1055 de 1ro. de diciembre de 2003 se presentó aviso de demanda en el caso KPE2003-2762, en la que se identifica como demandante a Roberto Camino Landrón y María Teresa Oliver (Camino y Oliver), en relación con incumplimiento de contrato e interdicto preliminar referente al apartament PH 1903 del Condominio Plaza Stella, finca 41,935. Del expediente no surge notificación del edicto a Camino y Oliver, ni a la peticionaria M.O. & Asociados. El referido Edicto de Subasta tampoco indica que se notificó a acreedores posteriores, tales como Firstbank, cuya entidad es acreedora de una hipoteca de $3,000,000.

Mediante declaración jurada de 4 de abril de 2006, se acreditó que el edicto de subasta fue publicado el 25 de marzo y el 1ro. de abril de 2006 en el Periódico El Nuevo Día.

El 10 de abril de 2006, el Sr. Josué D. Muñoz Muñiz suscribió una declaración jurada, en la que afirmó que el edicto de subasta fue colocado en la Casa Alcaldía de San Juan, en el Centro Judicial de San Juan, en el Departamento de la Familia en San Juan, en la Escuela Central High y en el Cuartel de la Policía de Santurce.

El 2 de mayo de 2006, Virgen Figueroa Maldonado, Secretaria de la representación legal de Plaza Noreste, Inc., suscribió una declaración jurada en la que manifestó que el 28 de marzo de 2006 envió el edicto de subasta -por correo certificado con acuse de recibo- a Stella Properties, Inc. La dirección para la notificación del edicto de subasta a Stella Properties resulta ser la misma dirección de Plaza Noreste, Inc.

El 10 de mayo de 2006, se presentó una Moción Informativa, en la que se informa haber notificado copia del edicto a Stella Properties.

El 2 de mayo de 2006, se suscribió un Acta de Subasta, en la que se declara desierta. No obstante, la

primera subasta había sido convocada para el próximo día. Se afirma que la abogada de Plaza Noreste, Inc., había estado presente. El 3 de mayo de 2006 se suscribe otra Acta de Subasta desierta, mediante la que se corrigió la fecha de la primera subasta.

El 10 de mayo de 2006, se suscribió Acta de Subasta desierta, correspondiente a la segunda fecha separada para la subasta. Se afirma que la representación legal de Plaza Noreste estuvo presente.

El 17 de mayo de 2005 se suscribió el Acta de la tercera subasta, en la que se hace constar la presencia de la abogada de Plaza Noreste; que el Sr. Armando Vilás Gómez se retiró como licitador, quedando como único licitador Plaza Noreste, Inc., que ofreció $3,000,000. Tras anunciar la oferta, se procedió a adjudicar la propiedad a Plaza Noreste, Inc., cuyo pago se hizo mediante compensación con cargo a la sentencia dictada en este caso, cuyo balance era, a esa fecha, $2,854,127.19, por lo que completó la diferencia haciendo entrega de un cheque certificado por la suma de $145,872.81, para un total de $3,000,000.

La escritura de venta judicial se suscribió el 17 de mayo de 2006, según consta en la certificación hecha por el Alguacil Juan Antonio Larroy Rodríguez, en la escritura sobre venta judicial. No obstante, la escritura de venta judicial se otorgó dos días después.

Como parte del trámite de venta judicial, se preparó un Certificado de Resolución Corporativa Plaza Noreste, Inc., juramentada el 18 de mayo de 2006 en la que se autorizó a Carlos R. Colón Garay, Gerente General de Plaza Noreste, Inc., a suscribir la escritura a nombre de Plaza Noreste. Sin embargo, aduce la parte peticionaria, que del Registro de Corporaciones del Departamento de Estado se desprende que para esa fecha el registro de la corporación Plaza Noreste Inc., había sido cancelado y que no fue hasta el 27 de septiembre de 2006 que solicitó un certificado de renovación.

La primera y única comparecencia de Plaza Stella en el caso fue una solicitud del retiro de los $145,872.81 depositados por Plaza Noreste, Inc. Dicha solicitud fue autorizada el 20 de junio de 2006 por el foro primario.

Dicho cheque fue recogido por Luis Chévere, quien identificó su número de teléfono como el 721-8062, cuyo número telefónico, según plantea la peticionaria, pertenece a Empresas Ferrer y a Plaza Noreste, Inc. Corresponde, además, al teléfono de Plaza Noreste, Inc., según la alegación 1 de la demanda.

El 11 de mayo de 2007, la peticionaria M.O. & Asociados presentó una solicitud de intervención en la que pidió se le admitiera como parte a los fines de impugnar la validez de la sentencia y la venta judicial. Plaza Noreste se opuso a la intervención el 23 de mayo de 2007.

Tras varios escritos de las partes en torno a la moción presentada, el 6 de junio de 2007, notificado el 12 de junio de 2007, se denegó la solicitud de intervención presentada.

Inconforme, la peticionaria presentó recurso de *certiorari* (KLCE07-1148) para que revisemos la determinación del foro de primera instancia. Aduce, en síntesis, que su intervención persigue obtener el relevo de la sentencia dictada en el caso de autos, debido a que la misma fue obtenida en fraude de acreedores. Arguye que con la intervención, pretende tener la oportunidad de presentar prueba en apoyo de sus alegaciones.

Aunque reconoce que su solicitud de intervención la ha presentado en una etapa post sentencia, aduce que ésta es oportuna debido a que la solicitó tan pronto tuvo conocimiento de este caso. Precisamente solicita un remedio post sentencia, disponible al amparo de la Regla 49.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 49.2. Además, sostiene que los actos en fraude de acreedores son rescindibles a tenor de lo dispuesto por el Artículo 1243 del Código Civil, 31 L.P.R.A. Sec. 3492.

El 12 de julio, notificado el 18 de julio de 2007, el foro primario denegó de plano la moción de reconsideración. No surge que el foro de primera instancia hubiese acogido la solicitud de reconsideración presentada por la parte peticionaria.

Tras la resolución en reconsideración dictada por el foro recurrido en el caso KLCE-07-01039, la parte peticionaria sometió otro escrito de *certiorari* –KLCE-07-01148-, en ánimo de evitar que su caso no pudiera ser atendido por prematuridad del primer recurso. En aras de la economía procesal, consolidamos ambos casos.

El 11 de octubre de 2007, la parte peticionaria solicitó una orden en auxilio de nuestra jurisdicción, en la que solicitó que paralicemos los procedimientos ante el foro primario.

Habiendo transcurrido en exceso el término para oponerse a la expedición del *certiorari* presentado y sin la comparecencia de la parte recurrida, procedemos a resolver.

## II
### Sobre la intervención

La intervención es un mecanismo procesal útil mediante el cual un tercero comparece voluntariamente o por necesidad para solicitar que se le incluya en una acción pendiente ante los tribunales. J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, Puerto Rico, **Publicaciones J.T.S.**, Tomo I, 2000, pág. 427. Por ello, la Regla 21.1 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone que:

*"Mediante oportuna solicitud, cualquier persona tendrá derecho a intervenir en un pleito: (a) cuando por ley o por estas reglas se le confiere un derecho incondicional a intervenir; o (b) cuando el solicitante reclame algún derecho o interés en la propiedad o asunto objeto del litigio que pudiere, de hecho, quedar afectado con la disposición final del pleito."*

La intención de esta Regla es permitir con mayor liberalidad la intervención de personas no incluidas originalmente como partes en un pleito. *R. Mix Concrete v. R. Arellano & Co.*, 110 D.P.R. 869, 873 (1981). La utilidad del mecanismo procesal establecido por esta Regla estriba en ofrecer protección a un nutrido e indefinido grupo de personas con variados intereses, en ocasiones de tremenda importancia pecuniaria o legal. *Íd.*

La decisión de permitir o no la intervención de una persona en un pleito depende del equilibrio a lograrse en la situación específica entre los valores en conflicto: el interés en la economía procesal representada por la solución en un sólo pleito de varias cuestiones relacionadas entre sí y el interés en evitar que los pleitos se compliquen y eternicen innecesariamente. *Íd.*

Así pues, la persona que solicita intervención debe reclamar algún derecho o interés en la propiedad o asunto objeto del litigio y debe demostrar que tal derecho o interés puede, de hecho, quedar afectado por la disposición final del pleito. No se trata de analizar en modo más o menos abstracto la naturaleza del interés concernido. El criterio a utilizarse es de orden más pragmático. ¿Existe *de facto* un interés que amerite protección? ¿Quedaría afectado, como cuestión práctica, tal interés por la ausencia del interventor en el caso? El análisis puede variar de pleito a pleito. En el fondo, la decisión depende del equilibrio a lograrse en la situación específica entre los valores en conflicto: el interés en la economía procesal representada por la solución en un sólo pleito de varias cuestiones relacionadas entre sí y el interés en evitar que los pleitos se compliquen y eternicen innecesariamente. *Chase Manhattan Bank v. Nesglo, Inc.*, 111 DPR 767 (1981).

El Tribunal Supremo ha sostenido que cuando a las personas ausentes del pleito no se les ha brindado la oportunidad de salvaguardar unos derechos e intereses que podrían verse afectados, no se le puede imprimir

finalidad a la adjudicación de la controversia medular. Dichas personas tienen que ser acumuladas como partes. No es suficiente ni siquiera que el ausente haya sido informado de su oportunidad de intervenir en el pleito. Mientras no sea parte, no se le puede privar de sus derechos mediante una sentencia. *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593 (1989); *Fuentes v. Tribl. de Distrito*, 73 D.P.R. 959, 981 (1952); *Pueblo v. Henneman*, 61 D.P.R. 189, 194 (1942).

En cuanto a la figura procesal de la intervención, la Regla 21.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 21.5, establece específicamente que cuando *"un alguacil procediere a cumplimentar una orden de ejecución, embargo o cualquier otra orden contra alguna propiedad mueble o inmueble, y dicha propiedad, o cualquier parte de ella, o algún interés en la misma, fuere reclamado por un tercero, éste tendrá derecho a presentar una demanda de intervención."* Esta intervención procede como cuestión de derecho.

La Regla 21.5 es una autóctona inspirada en la ya derogada Ley de Tercería de 14 de marzo de 1907. Esta Ley disponía que *"[l]a tercería respecto a bienes muebles se iniciará por demanda que formalizará el reclamante contra todas las personas que tengan interés en el asunto y el juicio se sustanciará por los trámites del Código de Enjuiciamiento Civil".* (Énfasis nuestro.) En cuanto a la posible suspensión de una subasta, la Ley establecía específicamente que ésta procedía sólo mediante interdicto prohibitorio *(injunction)* emitido de acuerdo a la Ley de *Injunctions* de 8 de marzo de 1906, *Aponte v. Román*, 145 D.P.R. 463 (1998).

## La reconsideración y el término para solicitar revisión

Dentro de los procedimientos civiles posteriores a una resolución emitida por el tribunal de instancia, se encuentra la moción de reconsideración regida por la Regla 47 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 47. En lo que nos concierne, la referida regla establece que una parte adversamente afectada por una resolución puede solicitar la reconsideración de una resolución en el plazo de quince (15) días a ser contado desde la notificación de la resolución o fecha de archivo en autos de la misma. La Regla 47, *supra,* impone al foro de instancia el deber u obligación de considerar una moción de reconsideración oportunamente presentada. Una vez considerada la moción en sus méritos, el tribunal tiene tres opciones, a saber: (1) tomar, dentro del término de diez días, *"alguna determinación"* respecto a la referida moción --por ejemplo, señalar la misma para vista, concederle término a la otra parte para que se exprese, etc.-- en cuya situación se entiende interrumpido el término de revisión; (2) declararla expresamente sin lugar dentro del mencionado término de diez días; y (3) dejar transcurrir el término de diez días --lo que la propia Regla 47 califica como *"rechazar de plano"*-- sin tomar acción alguna respecto a la moción radicada. En estas dos últimas situaciones, se considerará que el término de revisión nunca fue interrumpido. *Villanueva v. Hernández Class*, 128 D.P.R. 618, 632-634 (1991).

En lo que concierne al caso ante nuestra consideración, una moción bajo la Regla 47 se tendrá como rechazada de plano, y el término no será interrumpido en aquellos casos donde el tribunal se exprese con un mero *"No Ha Lugar"* a dicha moción sin oír a las partes o cuando el tribunal no tome acción dentro de los diez (10) días de haberse presentado la misma. *Rodríguez Rivera v. Autoridad de Carreteras*, 110 D.P.R. 184, 186-187 (1980). No obstante, es menester recordar, que transcurrido el plazo de diez (10) días dispuesto en la Regla 47, *supra,* una moción de reconsideración interrumpe el término si el foro primario acoge dicha moción y lo notifica antes de que transcurra el plazo para acudir ante este Tribunal. *Caro v. Cardona*, 158 D.P.R. 592, 599-600 (2003); *Lagares v. ELA*, 144 D.P.R. 601, 612 (1997).

La presentación de una moción de reconsideración en tiempo oportuno no tiene el efecto de interrumpir automáticamente el término para solicitar la revisión del dictamen del tribunal. Para tener tal efecto, tiene que ser acogida. *Soc. de Gananciales v. A.F.F.*, 108 D.P.R. 644, 646 (1979). En *Rodríguez Rivera v. Autoridad de Carreteras*, 110 D.P.R. 184, 187 (1980), nuestro Tribunal Supremo se expresó claramente en torno a la forma en que una moción de reconsideración interrumpe el plazo para recurrir. Se indicó en el referido caso que el término para recurrir se considerará como que nunca fue interrumpido en aquellos casos donde el tribunal de

instancia la rechaza de plano o deja de tomar alguna acción con relación a la misma dentro de los diez (10) días de presentada. Si el tribunal la rechaza con un mero no ha lugar, sin oír a las partes, se considerará que la moción fue rechazada de plano. Por otro lado, si señala vista para oír a las partes o se dirige a la parte adversa para que exponga su posición por escrito, o fundamenta su resolución declarando sin lugar la moción, se tendrá por interrumpido el término para apelar o solicitar revisión. *Rodríguez Rivera*, 110 D.P.R., a la pág. 187.

## III

De una revisión del expediente, surge que el foro primario nunca acogió la moción de reconsideración previo a dictar la resolución denegatoria de ésta. En virtud de ello, resolvemos que el término para solicitar revisión nunca se interrumpió con la resolución dictada en reconsideración. De ahí que los 30 días para presentar el recurso de *certiorari* comenzaron su decurso el 12 de junio de 2007, fecha en que el foro primario denegó la intervención solicitada. Dicho término venció el 13 de julio de 2007, por lo que el recurso KLCE-2007-01148 fue sometido fuera del término para presentación. En virtud de ello, desestimamos el recurso KLCE-2007-01148 y procedemos a resolver el recurso KLCE-2007-01039, presentado oportunamente

En el caso KLCE-07-01039 ante nuestra consideración, la parte peticionaria ha expresado y sostenido razones que apuntan a la necesidad de que se dilucide la controversia presentada. Su contención principal es que el préstamo que dio lugar al otorgamiento de un pagaré hipotecario a favor de Plaza Noreste y la posterior ejecución del inmueble -cuya venta a su favor fue ordenada por sentencia en otro caso-, tuvo el único fin de impedir que pudiera hacer efectiva dicha sentencia. Cuando para defraudar a los acreedores se simula un contrato, procede la acción de nulidad. *Roig Commercial Bank v. Portela*, 52 D.P.R. 647 (1938).

El Alto Foro ha resuelto que existen circunstancias en las cuales un tercero que no formó parte de un contrato puede pedir la rescisión de éste si demuestra que, entre otras cosas, dicho contrato se suscribió fraudulentamente. El Art. 1243 del Código Civil, 31 L.P.R.A. sec. 3492, dispone que los contratos suscritos en fraude de acreedores son rescindibles siempre que éstos no puedan cobrar lo que se les deba de ningún otro modo.

Este principio legal lo reitera el Art. 1246 del Código Civil, 31 L.P.R.A. sec. 3495, cuando establece que la acción de rescisión es subsidiaria, es decir, que *no podrá ejercitarse sino cuando el perjudicado carezca de todo otro recurso legal para obtener la reparación del perjuicio.* Por su parte, el Art. 1249, 31 L.P.R.A. sec. 3498, dispone que todos aquellos contratos por virtud de los cuales el deudor enajene bienes a título gratuito se presumen en fraude de acreedores. También se presumen fraudulentos aquéllos hechos a título oneroso por personas contra las cuales hubiese recaído sentencia condenatoria en cualquier instancia o expedido mandamiento de embargo de bienes. Art. 1249 del Código Civil, *supra*.

La regla general de que *el fraude no se presume*, sólo significa que aquél que lo afirma debe probarlo con *certeza razonable, esto es, con preponderancia de la evidencia que satisfaga la conciencia del juzgador. De Jesús Díaz v. Carrero*, 112 D.P.R. 631 (1982); *Canales v. Pan American*, 112 D.P.R. 329 (1982); *García López v. Méndez García*, 102 D.P.R. 383 (1974); *Carrasquillo v. Lippitt & Simonpietri, Inc.*, 98 D.P.R. 659 (1970). Si bien el Art. 1249 de nuestro Código Civil establece varias presunciones de fraude, éstas no constituyen los únicos medios para probarlo. Su apreciación, como cuestión de hecho, es de la exclusiva competencia del juzgador de instancia. *González v. Quintana*, 145 D.P.R. 4563 (1998). Aunque cuando el Tribunal Supremo resolvió el caso de *Serrano López* se requería que la parte demandante presentara prueba sólida, clara y convincente para probar el alegado fraude, en *De Jesús Díaz v. Carrero*, 112 D.P.R. 631 (1982), dicho foro abandonó la referida norma y resolvió que *"la regla general de que el fraude no se presume sólo significa que aquél que lo afirma debe probarlo con certeza razonable, con preponderancia de prueba que satisfaga la conciencia del juzgador."* Por otra parte, es al acreedor alegadamente defraudado al que le corresponde alegar y probar, entre otras cosas, que la rescisión del contrato de enajenación es el único recurso legal que tiene disponible para obtener la reparación del perjuicio sufrido. *García Zaragoza v. García Ortiz*, 83 D.P.R. 594

(1961). También es el acreedor impugnante el que debe demostrar que no existen bienes suficientes en el patrimonio del deudor, aparte de los enajenados, para satisfacer su crédito. *VELCO v. Industrial Serv. Apparel,* 143 D.P.R. 243 (1997).

Ahora bien, en aquellos casos en los cuales la enajenación del bien haya sido a título oneroso y se presuma en fraude de acreedores —conforme lo dispone el segundo párrafo del Art. 1249, *supra*—, una vez establecida dicha presunción, le corresponde al adquiriente del bien, o al deudor, ofrecer prueba de que desconocía de la sentencia o embargo que sujetaba el bien al momento de dicha enajenación. *VELCO v. Industrial Serv. Apparel, supra.* Para ello, no obstante, es preciso que el foro recurrido le concediera dicha oportunidad a la parte peticionaria.

En su moción de intervención, la parte peticionaria discutió con detalles los hechos por los que alega la existencia de conducta en fraude de acreedores por parte de Plaza Noreste y de Stella Properties. Específicamente arguye que cinco días después de celebrada la vista transaccional en el caso KPE2003-2762, donde estuvieron presentes oficiales de Stella Properties, Inc., y de Empresas Ferrer, Inc., se presentó una solicitud de anotación de rebeldía y de sentencia en el caso ante nos.

No se informó al Tribunal, en la vista transaccional, la existencia de deuda alguna con Plaza Noreste, Inc., que estaba garantizada con el apartamento, ni del pleito en ejecución de hipoteca.

Se alega, además, en la moción de intervención presentada, que la peticionaria posee un interés propietario sobre el apartamento PH 1903, por razón de tener un contrato de opción de compraventa, un aviso de pleito pendiente anotado en el Registro de la Propiedad y una Sentencia que obliga a Stella Properties, Inc. y a Empresas Ferrer, Inc.

Por último, aduce la parte peticionaria que Plaza Noreste, Inc., sus representantes, agentes, directores y abogados, en contubernio con Stella Properties, Inc., adelantaron la radicación de este pleito para la ejecución de una hipoteca, en fraude de acreedores y en fraude al Tribunal, para eludir su responsabilidad contractual con la peticionaria. En apoyo de su contención, señala que los oficiales de Stella Properties, Inc., Empresas Ferrer, Inc., y Plaza Noreste, Inc. son Eduardo Ferrer Bolívar o Eduardo Ferrer Ramírez de Arellano, y de las tres, su tesorero y/o Gerente General es Carlos Colón Garay, CPA.

Ante el foro primario, Plaza Noreste arguyó que la peticionaria no es acreedora de Plaza Noreste, Inc., ni tampoco de Stella Properties, Inc., ya que lo que tiene "*es una sentencia que el ordena el cumplimiento específico de una obligación y no al pago de una deuda*", por lo que sostuvo que ni siquiera le aplica la presunción de fraude de acreedores del Artículo 1249. Asimismo, adujo Plaza Noreste que la deuda de Stella Properties, Inc. a su favor estaba ampliamente documentada con cheques cancelados que datan de fecha anterior a que Camino y Oliver presentaran el caso KPE2003-2762.

Ciertamente, ambas partes tienen argumentos que justifican que, dada su seriedad, se permita la intervención con el propósito de que se desfile prueba para atender la controversia.

Aun cuando no nos pronunciemos en torno a los méritos de la controversia presentada, los asuntos vertidos en la solicitud de intervención claramente cumplen con los requisitos jurisprudenciales que inclinan a concederla. Quedó demostrado el derecho o interés en la propiedad o asunto objeto del litigio, y que tal derecho o interés puede, de hecho, quedar afectado por el resultado de éste. *Chase Manhattan Bank v. Nesglo,* Inc., 111 D.P.R. 767, 770 (1981).

La misión principal de las cortes de justicia es proporcionar un remedio legal adecuado para la reparación de cualquier daño que haya sido ilegalmente causado al que ante ellas acude en demanda de auxilio. *Ubi jus, ibi*

*remedium.* Mayor aún debe ser el celo y el cuidado de los tribunales, en el cumplimiento de tan alta misión, cuando se trata de perseguir o de evitar el fraude y la simulación. *De Jesús Díaz v. Carrero,* 112 D.P.R. 631 (1982); *Castellón v. Padín,* 60 D.P.R. 378, 385-386 (1942).

Resolvemos que se cometió el error apuntado por la parte peticionaria, por lo que revocamos la resolución recurrida, a los fines de permitir la intervención de la parte peticionaria.

## IV

Por los fundamentos discutidos, expedimos el auto en el caso KLCE-2007-01039 y revocamos la determinación recurrida, a los fines de autorizar la intervención de M.O. & Asociados. A tenor, se devuelve el caso al foro recurrido para dilucidar la controversia presentada por la parte peticionaria, sobre nulidad de la sentencia y fraude de acreedores.

Se desestima el caso KLCE-2007-01148, por haber sido presentado fuera del término dispuesto para ello.

Lo acuerda y manda el Tribunal y lo certifica la Secretaria.

Lcda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones